In The

# United States Court of Appeals

### For The Ninth Circuit

**CORRINE MORGAN THOMAS**, *et al.*,

*Plaintiffs-Appellants,*

v.

**COUNTY OF HUMBOLDT, CALIFORNIA**, *et al.*,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 1:22-cv-5725-RMI
HON. ROBERT M. ILLMAN

## BRIEF OF APPELLANTS

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
(415) 983-1865
thomas.loran@pillsburylaw.com

Derek M. Mayor
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4703
derek.mayor@pillsburylaw.com

**INSTITUTE FOR JUSTICE**
Jared McClain
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org

Robert Johnson
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT REGARDING ORAL ARGUMENT ....................................... xii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION .................................................... 4

STATEMENT OF ISSUES ................................................................ 4

STATEMENT OF CASE .................................................................. 5

    A. The County's Cannabis-Abatement Program ...................... 5

    B. Plaintiffs' Unending Plight ............................................... 9

    C. The proceedings Below .................................................. 12

SUMMARY OF THE ARGUMENT ................................................. 13

STANDARD OF REVIEW .............................................................. 15

ARGUMENT ................................................................................. 15

I.    PLAINTIFFS' CLAIMS ARE TIMELY ...................................... 15

II.   PLAINTIFFS' ALLEGATIONS, PROPERLY ASSESSED, STATE FIVE CLAIMS ...... 17

    A. The Trial Court Twisted the Pleading Standard .............. 17

       1. The Trial Court Refused to Credit Plaintiffs' Allegations ......... 17

       2. The Trial Court Abused Judicial Notice ..................... 21

       3. The Trial Court Invented Reasons Why Allegations Were "Unripe" .......... 22

ii

B. When Their Allegations Are Credited, Plaintiffs Stated Five Claims for Relief ........................................................................ 25

    1. The County's Cannabis-Related Abatements Violate Procedural Due Process ....................................................... 25

    2. The County's Indifference to Innocence Violates Substantive Due Process ............................................................. 38

    3. The County Uses Unconstitutional Conditions to Coerce Settlements ............................................................... 45

    4. Excessive Fines Fuel the County's Cannabis-Abatement Program ................................................................... 49

    5. The Seventh Amendment Applies to Civil Penalties ............... 65

III. THIS CASE WARRANTS REASSIGNMENT ON REMAND ............................... 67

CONCLUSION .................................................................... 70

STATEMENT OF RELATED CASES ................................................. 71

CERTIFICATE OF COMPLIANCE ................................................. 72

ADDENDUM ...................................................................... 73

ADDENDUM TABLE OF CONTENTS .............................................. 74

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*18 Unnamed "John Smith" Prisoners v. Meese*,
    871 F.2d 881 (9th Cir. 1989) ................................................................ 54

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................... 55

*Action Apt. Ass'n, Inc. v. Santa Monica Rent Ctrl. Op. Bd.*,
    509 F.3d 1020 (9th Cir. 2007) ............................................................ 16

*Akins v. Epperly*,
    588 F.3d 1178 (8th Cir. 2009) ............................................................ 41

*Angelotti Chrio., Inc. v. Baker*,
    791 F.3d 1075 (9th Cir. 2015) ............................................................ 37

*Arias v. Raimondo*,
    860 F.3d 1185 (9th Cir. 2017) ............................................................ 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................... 18, 19, 20

*Austin v. United States*,
    509 U.S. 602 (1993) ..................................................................... 63, 64

*Ballinger v. Oakland*,
    24 F.4th 1287 (9th Cir. 2022) ....................................................... 46, 48

*Bank of Columbia v. Okely*,
    17 U.S. (4 Wheat.) 235 (1819) ........................................................... 40

*Barry v. Barchi*,
    443 U.S. 55 (1979). ..................................................................... 29, 38

*Beatty v. Tong*,
    2023 WL 2384111 (D. Conn. Mar. 6, 2023) ........................................ 53

iv

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..........................................................18, 19

*Blanchette v. Conn. Gen. Ins. Corps.,*
  419 U.S. 102 (1974) ......................................................... 53, 54

*Boddie v. Connecticut,*
  401 U.S. 371 (1971)................................................................. 37

*Carey v. Piphus,*
  435 U.S. 247 (1978) ...............................................................48

*Cheffer v. Reno,*
  55 F.3d 1517 (11th Cir. 1995) ................................................ 52

*Club Madonna, Inc. v. Miami Beach,*
  924 F.3d 1370 (11th Cir. 2019)............................................... 53

*Colbert v. Chicago,*
  851 F.3d 649 (7th Cir. 2017) ................................................. 42

*Conley v. Gibson,*
  355 U.S. 41 (1957) ................................................................. 18

*Doe I v. Nestle USA, Inc.,*
  766 F.3d 1013 (9th Cir. 2014) ............................................... 22

*Dolan v. Tigard,*
  512 U.S. 374 (1994)...........................................................46, 48

*Duffner v. St. Peters,*
  930 F.3d 973 (8th Cir. 2019) ................................................. 52

*Engquist v. Or. Dep't of Agric.,*
  478 F.3d 985 (9th Cir. 2007)................................................. 55

*Evon v. Law Offices of Sidney Mickell,*
  688 F.3d 1015 (9th Cir. 2012)............................................... 67

*FDIC v. Mallen,*
  486 U.S. 230 (1988) .........................................................29, 30

*Firestone Fin. Corp. v. Meyer*,
796 F.3d 822 (2015) ............................................................ 15, 18, 19, 20

*Flynt v. Shimazu*,
940 F.3d 457 (9th Cir. 2019) ...................................................17

*Fuentes v. Shevin*,
407 U.S. 67 (1972) ......................................................... 24, 26, 27

*Galfer v. Los Angeles*,
2015 WL 13917043 (C.D. Cal. Mar. 6, 2015)........................................... 31

*Gerstein v. Pugh*,
420 U.S. 103, 124 (1975) ...................................................... 41

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)............................................................66

*Gregg v. Haw. Dep't of Pub. Safety*,
870 F.3d 883 (9th Cir. 2017) ...................................................15

*Harris v. Riverside Cnty.*,
904 F.2d 497 (9th Cir. 1990) ................................................... 27

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ................................................. 34

*In re Gilead Sci. Secs. Lit.*,
536 F.3d 1049 (9th Cir. 2008)................................................20

*In re Ruffalo*,
390 U.S. 544 (1968)........................................................32

*Ingram v. Wayne Cnty.*,
2023 WL 5622914 (6th Cir. Aug. 31, 2023) ...........................................30

*Johnson v. Grants Pass*,
72 F.4th 868 (9th Cir. 2023) ................................................. 54

*Joseph v. Koh*,
2020 WL 5408042 (N.D. Cal. Sept. 9, 2020)...........................................52

*Joseph v. Koh,*
  2020 WL 5824491 (N.D. Cal. Oc. 1, 2020) ................................. 52

*Khoja v. Orexigen Thera., Inc.,*
  899 F.3d 988 (9th Cir. 2018) ........................................... 15, 21

*Kinzli v. Santa Cruz,*
  818 F.2d 1449 (9th Cir. 1987) ............................................. 24

*Koontz v. St. Johns River Water Mgmt. Dist.,*
  570 U.S. 595 (2013) ..................................................... 17, 46

*Laase v. Isanti Cnty.,*
  638 F.3d 853 (8th Cir. 2011) ............................................. 53

*Latif v. Holder,*
  28 F. Supp. 3d 1134 (D. Ore. 2014) ...................................... 31

*Leslie v. Doyle,*
  125 F.3d 1132 (7th Cir. 1997) ........................................... 60

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) .................................................... 26, 29

*Miller v. Vazquez,*
  868 F.2d 1116 (9th Cir. 1989) ............................................ 41

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
  339 U.S. 306 (1950) ...................................................... 32

*N. Pacifica LLC v. Pacifica,*
  528 F.3d 478 (9th Cir. 2008) ............................................. 40

*Nollan v. Cal. Coastal Comm'n,*
  483 U.S. 825 (1987) ...................................................... 46

*Nozzi v. Hous. Auth. of L.A.,*
  806 F.3d 1178 (9th Cir. 2015) ............................................ 33

*Orloff v. Cleland,*
  708 F.2d 372 (9th Cir. 1983) ............................................. 26

*Patsy v. Bd. of Regents,*
    457 U.S. 496 (1982) ...................................................51

*Pennsylvania v. West Virginia,*
    262 U.S. 553 (1923) ..................................................51

*Pimentel v. Los Angeles,*
    974 F.3d 917 (9th Cir. 2020) ............................... 56, 58

*Safeway Stores, Inc. v. Haw. Bd. of Argic.,*
    590 F. Supp. 778 (D. Haw. 1984).......................... 55

*Santosky v. Kramer,*
    455 U.S. 745 (1982) ................................................. 29

*Scheer v. Kelly,*
    817 F.3d 1183 (9th Cir. 2016)................................ 16

*Sierra Club v. Khanjee Holding (US) Inc.,*
    655 F.3d 699 (7th Cir. 2011) ................................. 52

*St. Ann v. Palisi,*
    495 F.2d 423 (5th Cir. 1974)................................. 43

*Stevens v. Columbus,*
    2022 WL 2966396 (6th Cir. July 27, 2022) ........... 52

*Stine v. Ariz. Dep't of Corr.,*
    937 F.2d 613 (9th Cir. 1991)................................. 32

*Stypmann v. San Francisco,*
    557 F.2d 1338 (9th Cir. 1977)...........................30, 38

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)..................................................51

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019) ....................................... 56, 63

*Traficanti v. United States,*
    227 F.3d 170 (4th Cir. 2000) ................................. 53

*Tull v. United States,*
    481 U.S. 412 (1987) ........................................................... 66, 67

*United States v. $8,850 in U.S. Currency,*
    461 U.S. 555 (1983) ................................................................ 35

*United States v. $49,576.00 U.S. Currency,*
    116 F.3d 425 (9th Cir. 1997) .................................................... 29

*United States v. $100,348.00 in U.S. Currency,*
    354 F.3d 1110 (9th Cir. 2004) ........................................ 57, 58, 61

*United States v. 2007 Honda Civic EX Sedan,*
    2014 WL 4211203 (W.D. Wis. Aug. 25, 2014) .......................... 60

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ............................................ 56, 57, 59, 62, 64

*United States v. Crozier,*
    777 F.2d 1376 (9th Cir. 1985) .................................................. 36

*United States v. Garcia,*
    151 F.3d 1243 (9th Cir. 1998) ................................................. 43

*United States v. Jones,*
    731 F. Supp. 2d 1275 (M.D. Fla. 2010) .................................... 52

*United States v. Reyes,*
    313 F.3d 1152 (9th Cir. 2002) ................................................. 69

*United States v. Rivera,*
    682 F.3d 1223 (9th Cir. 2012) ................................................. 68

*United States v. Ruiz-Villanueva,*
    680 F. Supp. 1411 (S.D. Cal. 1988) ......................................... 55

*United States v. Sears, Roebuck & Co., Inc.,*
    785 F.2d 777 (9th Cir. 1986) ................................................... 67

*Vanelli v. Reynolds Sch. Dist. No. 7,*
    667 F.2 d 773 (9th Cir. 1982) .................................................. 26

ix

*Walters v. Reno,*
  145 F.3d 1030 (9th Cir. 1998) ........................................... 27, 32

*Weber v. Aetna Cas. & Sur. Co.,*
  406 U.S. 164 (1972) ...........................................................42, 60

*Williams v. Fanning,*
  332 U.S. 490 (1947) ............................................................ 12

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,*
  473 U.S. 172 (1985) ............................................................24

*Winslow v. Smith,*
  696 F.3d 716 (8th Cir. 2012) ............................................. 41

*Wiren v. Eide,*
  542 F.2d 757 (9th Cir. 1976) ............................................ 37

*Wright v. Beck,*
  981 F.3 719 (9th Cir. 2020).................................................32

*Wright v. Riveland,*
  219 F.3d 905 (9th Cir. 2000)...............................................63

*Yagman v. Garcetti,*
  852 F.3d 859 (9th Cir. 2017) ...........................................30

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
  433 F.3d 1199 (9th Cir. 2006) .......................................54–55

## STATUTES

28 U.S.C. § 1291...................................................................4

28 U.S.C. § 1331...................................................................4

28 U.S.C § 1343 ...................................................................4

## RULES

Fed. R. Civ. P. 8(a)(2).......................................................... 18

Fed. R. App. P. 4(a)(1)(A)......................................................4

**CODES**

HCC § 352-2(b)(2) ................................................................. 50

HCC § 352-3(i) ..................................................................... 50

HCC § 352-3(m)(2) .............................................................. 50

HCC § 352-3(h) .................................................................... 57

HCC § 352-6(b) .................................................................... 50

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully submit that oral argument is warranted in this case given the importance of these issues for the named Plaintiffs, the hundreds of class members affected by Humboldt County's Code Enforcement program, and the people in other jurisdictions that are now emulating the type of suspicion-less and fine-driven code enforcement that Humboldt pioneered to maximize government proceeds from cannabis.

## INTRODUCTION

Humboldt County fines people millions of dollars for things they didn't do because it doesn't care that they're innocent. Following California's legalization of cannabis, the County adopted a fine-driven code-enforcement program. The County charges people with cannabis-adjacent offenses based on permitting violations on their property. Under the guise of nuisance-abatement orders, it fines them millions of dollars while it denies them the permits they need to "abate" the violations. People who appeal wait years for hearings that never come. All the while, the County uses ruinous fines and permit denials to pressure people into settlements, unconcerned with guilt.

Take Plaintiff Rhonda Olson, for example. The County acknowledged that the permitting issues on her new property were decades old and harmless to the community. It still fined her $7.47 million because the prior owner grew cannabis near old logging flats that a *different* prior owner graded without a permit—all before she bought the place. She requested a hearing back in 2020 and is still waiting, unable to develop her property while she waits.

These cannabis-abatement orders aren't like normal tickets. Once the County decides that cannabis might have been on a property, it issues an

abatement order with self-executing penalties that run automatically after 10 days.  People then have three choices: (1) pay the County to settle; (2) do nothing and lose their property to a judgment lien; or (3) appeal.  But those who appeal never actually receive a hearing.  Some Plaintiffs and members of the proposed class have been waiting up to five years for a hearing, despite the County insisting it had all the evidence it needed before issuing their abatement orders.  And if the County ever does schedule a hearing, it restricts the hearing officer's discretion to reduce the fines and denies the right to a jury.

Innocent people are trapped unless they pay their way out.  The insurmountable fines, permit denials, and indefinite delays all leave the accused feeling like settlement is their only option.  A punishment system uninterested in guilt is unconstitutional.

The County's abatements violate the Constitution in five ways.  *First*, a system designed to squeeze money out of people without providing them a hearing violates procedural due process.  *Second*, the County's arbitrary issuance of penalties and its indifference to innocence violate substantive due process.  *Third*, making non-remedial permits contingent on settling abatement cases is an unconstitutional condition.  *Fourth*, the penalties for cannabis-related violations are unconstitutionally excessive, both on their

face and as applied to innocent purchasers. And *fifth*, the Seventh Amendment guarantees a jury in suits for penalties like these.

The trial court, however, dismissed the complaint in its entirety. It ruled that Plaintiffs' allegations were implausible and unworthy of the presumption of truth. The court declared—at the motion-to-dismiss stage— that the County's code enforcement has been "even-handed, proportionate, non-discriminatory, and non-arbitrary." Plaintiffs ask this Court to reverse and remand the case to a judge who will apply the law correctly and impartially.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1343. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on May 12, 2023. 1-ER-2. Plaintiffs' appeal, noticed on June 7, 2023, 4-ER-757, was timely under Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

I. Can Plaintiffs raise facial and as-applied challenges to county laws and enforcement practices within two years of the County's enforcement?

II. Did Plaintiffs' allegations, properly credited, state claims that the County's cannabis-abatement program violates (1) procedural due process; (2) substantive due process; (3) the unconstitutional-conditions doctrine; (4) the Excessive Fines Clause; and (5) the Seventh Amendment?

## PERTINENT PROVISIONS

See addendum.

## A. The County's Cannabis-Abatement Program

Humboldt County responded to the legalization of marijuana by amending its code to maximize revenue at the expense of civil rights. 4-ER-694. The changes relevant to this appeal relate to the Planning Department's Code Enforcement Unit. The County made cannabis cultivation, plus *all* other code violations that "exist[] as a result of or to facilitate the illegal cultivation of cannabis," into Category 4 offenses—the code's most severe category, reserved for intentional violations or those committed through inexcusable neglect that "have a significant and/or substantial impact" on public health and safety. 4-ER-695, -697. Category 4 violations carry a daily fine of $6,000-$10,000. Things that would otherwise be a "Category 1" offense with a daily fine of $1-$1,000, like the failure to get a permit before building a temporary greenhouse, now carry a minimum daily fine of $6,000 if there's any connection to cannabis. *Id.* The County's standard practice is to charge three violations per property, at $30,000 per day. 4-ER-704-05. The fines run for 90 days. One of the program's chief architects, Supervisor Rex Bohm, once questioned whether the Planning Department should charge something more reasonable or if it

5

"throw[s] out these fines that are gonna be 35 million dollars" just "to scare the panties off" people. 4-ER-705.

Increasing penalties for basic code violations was a bigger deal in Humboldt than it might have been elsewhere. For over 50 years, Humboldt has attracted off-the-grid homesteaders and counterculture types and acquiesced as they built their own homes and accessory structures without getting permits. *Id.* Permitting violations were so rampant that the County created a "Safe Home" program, which gives people a full decade to come forward and get as-built permits for their homes without penalties. 4-ER-711. But while the County dangled the carrot of amnesty, it handed its Code Enforcement Unit the stick of excessive fees to swing at anything it perceived as illegal growth. *Id.* At $10,000 per day, the fines are unpayable for residents who, on average, earn less than $30,000 a year. 4-ER-692, -708.

To expedite enforcement, the County made structural changes to penalize people more easily. Imposing a land-use fine used to be a multistep process that took at least 75 days and required a hearing before the Board of Supervisors to assess a penalty. 4-ER-695-96. The County streamlined that process and vested every Code Enforcement officer with the power to assess

fines that begin to run just 10 days after they serve the initial notice of violation and order to abate a nuisance (together, "NOV"). *Id.*

The County also switched from a complaint-based system to one in which Code Enforcement has roving jurisdiction to identify and punish violations. 4-ER-696. Correspondent with these changes, the County began imposing Category 4 penalties for all permitting violations that could possibly be related to cannabis. *Id.* The County now treats things like greenhouses as inherently suspect and imposes Category 4 penalties for illegal cannabis cultivation without any evidence there's cannabis. 4-ER-696-97.

To further scale up enforcement, the County began using satellites and drones to identify properties that built a greenhouse, accessory structure, graded flat of land, or access road, or removed trees without a permit. 4-ER-697-98. Enforcement by satellite has led to a rash of unfounded charges and armed raids on innocent people. 4-ER-698-99. Because the County's grainy and imprecise satellite images can't reveal what's inside a structure—let alone whether the owner violated the code *for the purpose* of cultivating cannabis illegally—the County has imposed Category 4 penalties for violations related to things like farming, gardening, growing produce and lavender, and rearing chicks. 4-ER-698-700. Code Enforcement's unkeen

eye has mistaken a cluster of solar panels for a greenhouse containing cannabis and a patch of tomatoes for an outdoor grow.  4-ER-699.

Yet the County continues to shift the cost of its errors to innocent residents.  It imposes Category 4 penalties based solely on crude satellite images, without any further investigative steps to confirm there's cannabis.  4-ER-700.  It calls these violations "unreviewed," and they account for most of the County's code enforcement.  4-ER-698, -700.  When the County has probable cause to believe there's cannabis, it gets a search warrant; when it doesn't, it issues Category 4 penalties.  4-ER-701.

The County also imposes these Category 4 penalties on people who bought their property from someone who grew cannabis.  *Id.*  Code Enforcement treats these conduct-based offenses as if they run with the land, even though it doesn't record the violations against the title like the code requires.  4-ER-701-02.  Instead, the County waits until a new owner records title and then fines them for the prior owner's cannabis growth— even though the County knows they weren't responsible.  4-ER-701.

This whole system is designed to force people into settlements.  4-ER-702-04.  When someone receives an NOV, the County gives them three options: (1) pay to settle the claim; (2) do nothing and lose the property to a judgment lien; or (3) appeal.  4-ER-723.  If they appeal, though, the County

rarely schedules a hearing. 4-ER-708-11. And regardless of guilt, the County makes accused landowners pay up to $4,500 for the cost of their own prosecution. 4-ER-712-14, -729.

### B. Plaintiffs' Unending Plight

Plaintiffs all received cannabis-abatement orders for violations that either they didn't commit or had nothing to do with cannabis. They requested hearings and then waited years while the County continually used the threat of fines worth more than their properties to pressure them into admitting guilt, paying the County a settlement, and waiving their Fourth Amendment rights in perpetuity. 4-ER-721-23.

Corrine and Doug Thomas received an NOV in August 2021, just six days after they bought their property. 4-ER-716-17. The County imposed $12,000 daily fines for an unpermitted structure with a nexus to illegal cultivation that the County was aware of since at least 2019. *Id.* The County ordered them to destroy the three-story structure even though the County cleared it of cannabis two years before they bought the property. 4-ER-717. The demolition would cost the Thomases $180,000 plus treble fees (another punishment for someone else's cannabis growth) and require them to remove old growth trees. 4-ER-718-19. The Thomases initially agreed to the County's demands under the duress of nearly $1 million in fines and fees.

4-ER-719-20.  But after a public backlash, the County agreed to let them keep the structure if they met certain impossible conditions and paid penalty fees.  4-ER-720-21.  The Thomases rejected this offer and insisted on the appeal hearing that the County has still not provided.  4-ER-722.

Blu Graham received an NOV in May 2018 for an unpermitted greenhouse he used to grow produce and an unpermitted rainwater-catchment pond he used for fire prevention.  4-ER-722.  The County alleged both "unreviewed" violations had a nexus to cannabis and charged $10,000 in daily penalties.  *Id.*  Blu immediately appealed and tried to get the permits to avoid being fined.  4-ER-723-24.  The County told him he was ineligible for permits because of his pending cannabis-abatement case.  4-ER-724.  It then spent the next four-and-a-half years using the fines to pressure him to settle and telling him that he'd lose his appeal because the judges work for Code Enforcement: "We're going to impose the maximum fine on you."  4-ER-710.  Then, as Blu was preparing to file this lawsuit, the County suddenly scheduled his hearing.  4-ER-725-27.  The County dropped the pretense of cannabis and told him that if he went forward with his hearing that he'd owe $90,000 in fines for not having the grading permit it had refused to grant him.  4-ER-728.  Blu agreed to settle, though, because the County would not issue an unrelated permit for his home unless he did.  4-ER-728-29.

Rhonda Olson also received an NOV for a prior owner's cannabis growth right after she bought three adjacent parcels to build housing. 4-ER-730-32. Rhonda requested a hearing immediately and tried her best to comply with the abatement orders, but the County again refused to issue permits because of the cannabis violations. 4-ER-732-33. And when the County didn't think she was doing enough to comply "voluntarily," it sent new NOVs, carrying a staggering $83,000 in daily fines to turn up the pressure—even though County officials had already acknowledged she didn't commit the violations and the County was "not really worried" about them. 4-ER-730-34. The stress from the fines gave Rhonda shingles and blinded her temporarily. 4-ER-734. Rhonda's still waiting for the hearing she requested in 2020 and again in April 2022. *Id.*

Cyro Glad is another innocent purchaser. The County fined him after he transferred title to his name based on satellite images showing unpermitted buildings. 4-ER-735-36. Betraying the lack of investigation into unreviewed cases, Code Enforcement officials couldn't even find Cyro's rural property to post his NOV. 4-ER-736. He's been waiting for his hearing since November 2018. *Id.*

## C. The Proceedings Below

Plaintiffs filed their class-action complaint in October 2022. After the County moved to dismiss and asked the court to judicially notice 500+ pages of public and non-public documents, Plaintiffs amended their complaint. They added Cyro as a Plaintiff along with 132 new allegations. Many new allegations came from other abatement victims who attended a townhall about the lawsuit, and many were straight from the documents the County wanted judicially noticed—including its admission to punishing Rhonda for someone else's harmless violations. ECF 29-1.

The County again moved to dismiss and sought judicial notice. The trial court ruled against Plaintiffs on almost every conceivable issue and dismissed the case. The court determined, as an apparent matter of law, that all the County's regulations at issue "have been enforced in an even-handed, proportionate, non-discriminatory, and non-arbitrary manner." 1-ER-48-49. It ruled that Plaintiffs' claims were simultaneously untimely and time-barred, their allegations were "unripe," conclusory, implausible, and hyperbolic, that the official-capacity defendants weren't proper parties,[1] and that Plaintiffs failed to state a single claim. 1-ER-23-53.

---

[1] Since Plaintiffs sought prospective equitable relief against the County's enforcement officials, those Defendants were subject to suit in their official capacity. *Williams v. Fanning*, 332 U.S. 490, 493 (1947). Plaintiffs don't

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs' claims are timely because they arose within two years of filing and their injuries are ongoing. The trial court was wrong that facial claims need to be brought within two years of a law's passage, and it was also wrong that Plaintiffs didn't bring their as-applied claims within two years.

**II. A.** The trial court disregarded the pleading standard by (1) refusing to credit "implausible" factual allegations; (2) judicially noticing unspecified facts to surmise that the County's counterfactual was more believable than Plaintiffs' allegations; and (3) ignoring as "unripe" Plaintiffs' well-pleaded allegations about the County's blanket policy against issuing permits to properties under cannabis-related abatement orders. These legal errors and abuse of discretion permeated the entire decision and stripped Plaintiffs' claims of factual support, leaving them without a fair chance of surviving the motion to dismiss.

**B.** Plaintiffs' allegations, properly credited, stated five claims for relief:

**1.** The County's cannabis-abatement procedures violate due

---

appeal the clearly wrong decision to dismiss them as improper parties, however, given the trial court's ruling that they are "unnecessary" and will be bound by any decision against the County. 1-ER-37.

process because they're designed, from start to finish, to maximize revenue even if it deprives people of their rights erroneously.

**2.** The County violates substantive due process by penalizing people arbitrarily without regard for probable cause and by punishing new purchasers with an indifference to innocence.

**3.** The County uses its blanket policy of denying permits for properties under cannabis-abatement orders to coerce people into paying settlements and waiving their rights in abatement cases in exchange for unrelated non-remedial permits.

**4.** Category 4 penalties for cannabis-related offenses are unconstitutionally excessive both facially and as applied to innocent purchasers. This claim is ripe for review because Plaintiffs have already accrued the fines they're challenging, raise purely legal claims, and the unconstitutional penalties will coerce innocent people into settlements if this Court withholds judgment.

**5.** Although precluded by this Court's incorporation precedent, the Seventh Amendment guarantees a jury in actions to collect punitive fines.

**C.** This Court should remand the case to a new judge who can be, and will appear to be, impartial.

## STANDARD OF REVIEW

On appeal of a motion to dismiss, this Court reviews de novo whether Plaintiffs stated a claim, *Arias v. Raimondo*, 860 F.3d 1185, 1189 (9th Cir. 2017), and whether their claims were timely, *Gregg v. Haw. Dep't of Pub. Safety*, 870 F.3d 883, 886-87 (9th Cir. 2017). The court takes factual allegations as true and construes inferences in Plaintiffs' favor. *Id.*

A trial court's failure to construe facts in the non-moving party's favor is an error of law. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827-28 (9th Cir. 2015). Its use of judicial notice is reviewed for abuse of discretion. *Khoja v. Orexigen Thera., Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE TIMELY

The district court began its analysis by alluding to several reasons why Plaintiffs' claims weren't properly before the court. Its three actual holdings were: (1) facial challenges are time-barred more than two years after a law's passage, 1-ER-34-35; (2) Plaintiffs' as-applied challenges, "with the exception of the Thomases'," were also time-barred because they received

their NOVs more than two years before suing, 1-ER-34; and (3) Plaintiffs' Eighth Amendment claim wasn't ripe.[2]  1-ER-27-31.

Plaintiffs will address in section II.B.4.a why their Eighth Amendment claim is justiciable and dispose of the timeliness rulings here.

*First*, the trial court was wrong that facial challenges are time-barred more than two years after a law's passage.  The court adopted the County's misreading of *Action Apartment Association, Inc. v. Santa Monica Rent Control Operation Board*, 509 F.3d 1020 (9th Cir. 2007).  That case held that facial challenges to ordinances that immediately reduce or transfer property value must be brought within two years of an ordinance's passage because that's when the injury "should be apparent."  *Id.* at 1027.  As this Court has recognized, it "vastly overreads *Action Apartment*" to apply its holding "to *all* facial challenges."  *Scheer v. Kelly*, 817 F.3d 1183, 1187 (9th Cir. 2016).  The clock doesn't start until "a plaintiff 'knows or has reason to know of the actual injury,'" *id.* at 1188, which in this case was when the County enforced its unconstitutional policies against Plaintiffs.[3]

---

[2] The court also questioned the Thomases' standing because their NOV is addressed to the prior owner.  1-ER-30.  Bot the FAC explained that the County holds the Thomases responsible for those abatement orders as the current owner.  4-ER-701-02, -707, -718.

[3] Plaintiffs' only facial challenge is their Eighth Amendment claim, which the trial court held was simultaneously time-barred (1-ER-35) and unripe. 1-ER-31-32.

*Second*, with respect to Plaintiffs' as-applied challenges, the court was wrong on the facts and law. It was not just the Thomases who received an NOV within two years of filing; Rhonda received one in April 2022—about six months before filing this lawsuit. 4-ER-734. And besides, Plaintiffs' injuries are ongoing. Rhonda, Cyro, and the Thomases are all still trapped in the very processes that they're challenging here—they're still under abatement orders, still being denied process and jury rights, and still have excessive fines accrued against them. *See Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) ("continued enforcement of a statute inflicts a continuing or repeated harm"). Plus, Blu's unconstitutional-conditions claim arose in September 2022. 4-ER-727. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013) (the impermissible denial of a benefit is a cognizable injury).

Plaintiffs' claims are timely.

## II. PLAINTIFFS' ALLEGATIONS, PROPERLY ASSESSED, STATE FIVE CLAIMS

### A. The Trial Court Twisted the Pleading Standard

The decision below flouted the standards by which courts construe facts at the motion-to-dismiss stage in three ways: the court (1) refused to accept Plaintiffs' allegations as true; (2) abused judicial notice to draw inferences against Plaintiffs without identifying any facts from the

documents that disproved any particular allegation; and (3) ruled that Plaintiffs' allegations were "unripe."

### 1. The Trial Court Refused to Credit Plaintiffs' Allegations

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to provide only "'a short and plain statement'" of the claims to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although a complaint doesn't need "detailed factual allegations," it must include enough facts to show plaintiffs can prove their claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Applying this standard," the court must "first accept all well-pleaded facts in the complaint as true and then ask whether those facts state a plausible cause for relief." *Meyer*, 796 F.3d at 826-27 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). This rule applies regardless of whether the judge finds the allegations "doubtful in fact." *Twombly*, 550 U.S. at 555. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (citation omitted).

When assessing Plaintiffs' complaint, the court below abandoned its role of impartiality and perverted the *Twombly*/*Iqbal* "plausibility"

standard by refusing to credit unspecified factual allegations as implausible. The court declared broadly that, "the vast majority" of Plaintiffs' factual allegations were "either irrelevant or simply implausible." 1-ER-24. Nearly every merits decision then started with a general disclaimer that the court was discounting any "implausible" factual allegations—without specifying which allegations were implausible or why. For example, the court announced that Plaintiffs' procedural-due-process claim included "ineffectual and implausible allegations." 1-ER-38. All 10 ways Plaintiffs alleged their abatements violated due process, the court concluded, were "either implausible, irrelevant, conclusory, or based on unreasonable inferences or unwarranted deductions," but it didn't say which allegations fell into which category. 1-ER-38. Plaintiffs' substantive-due-process and unconstitutional-conditions claims faced similar incredulity. 1-ER-46, -48. These impermissible determinations of factual plausibility led the court to rule that Plaintiffs' "allegations are not entitled to a presumption of truth for present purposes." 1-ER-38. That decision was an egregious error.

As this Court has explained, it's an "erroneous application of *Twombly* and *Iqbal*" to judge the plausibility of factual allegations rather than legal claims. *Meyer*, 796 F.3d at 827. The "relevant question ... is *not* whether a complaint's factual allegations are true, but rather whether the complaint

contains sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face." *Id.* (cleaned up).

In *Meyer*, this Court reversed a trial court that dismissed a complaint based on its disbelief of Meyer's allegation that the defendant's vice president orally promised to provide Meyer's nascent business with $500,000 in credit on favorable terms. *Id.* Similarly, this Court reversed a trial court for disregarding the pleading standard based on its own "incredulity." *In re Gilead Sci. Secs. Lit.*, 536 F.3d 1049, 1057 (9th Cir. 2008). The Court admonished that "a district court ruling on a motion to dismiss is not sitting as a trier of fact." *Id.* Although the court need not credit conclusions or unwarranted deductions, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.*

It's not enough to say that the FAC contained conclusory statements. Of course it did. Like most detailed, speaking complaints, the FAC included topic sentences and legal conclusions that "provide[d] the framework of [the] complaint." *Iqbal*, 556 U.S. at 679. But there were also hundreds of factual allegations that informed Plaintiffs' claims, and the court should have "assume[d] their veracity and then determine[d] whether they

plausibly gave rise to an entitlement to relief." *Id.* Not doing so was erroneous.

## 2. The Trial Court Abused Judicial Notice

Compounding its error, the court announced that, based on its general sense that the FAC "paint[ed] such a distorted picture of interactions between Plaintiffs and the County," the court would judicially notice almost 600 pages of public and non-public investigatory records that the County offered to refute Plaintiffs' allegations. 1-ER-24. Much like the court's plausibility rulings, its judicial-notice decision did not identify which facts from the trove of documents that the court thought contradicted Plaintiffs' allegations. This too was an error.

As this Court has emphasized, a court taking judicial notice at the motion-to-dismiss stage must "clearly specify what fact or facts it judicially noticed" from the documents, and it must not take notice of facts "subject to varying interpretations" or "reasonable dispute." *Khoja*, 899 F.3d at 999-1000. Over-eagerness to rely on "judicial notice and the incorporation-by-reference doctrine"[4] to dismiss complaints leads to "unintended and

---

[4] The trial court also suggested it relied on incorporation by reference. 1-ER-25. Likely because the FAC didn't include incomplete documents, the court couldn't identify any incorporated by reference. *Khoja*, 899 F.3d at 1002. To the extent the court incorporated unreferenced documents to refute their well-pleaded allegations, doing so was another error.

harmful results." *Id.* at 998. "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Id.* at 999.

That's exactly what happened here. Rather than clearly identifying any judicially noticed facts, the court weighed 600 pages of cherry-picked records against the FAC and decided it believed the County more.[5] The decision to draw sweeping factual conclusions without identifying which allegations the judicially noticed records disproved was an abuse of discretion and violated the basic rule that courts must "read[] the allegations in the light most favorable to the plaintiffs" and grant them inferences. *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1024-25 (9th Cir. 2014).

### 3. The Trial Court Invented Reasons Why Allegations Were "Unripe"

The trial court disregarded as "unripe" all of Plaintiffs' allegations about the County's policy against issuing permits to properties with

---

[5] In judicially noticing everything, the trial court still managed to ignore facts that supported Plaintiffs' allegations, including the County confirming Rhonda couldn't get development permits until she cleared the Code Enforcement case opened against the prior owner. 3-ER-427.

cannabis-abatement orders. Legal claims—not factual allegations—are unripe. The court's decision to ignore Plaintiffs' allegations was based on its misunderstanding of the facts and the law.

Factually, the court was simply wrong that no Plaintiff applied for a non-remedial permit during their abatement case. 1-ER-32, -38. Blu paid $799 for a Safe Home permit. 4-ER-726-27. After the Planning Department accepted his money, Code Enforcement put a "hold" on his permit until he agreed to settle his abatement case. 4-ER-727, -729. County officials applied that same policy to Rhonda. When she emailed them to get a septic permit for her new property, they responded, "Just an FYI, no permits will be issued for properties with open Code Enforcement cases." 4-ER-733.

Blu's attorney also requested a permit to cure his grading violation in June 2018, but the County refused to issue one because of the abatement. 4-ER-724-25, -728. Even after Blu submitted an engineering report for the permit in January 2019, 4-ER-726, the County still refused to issue it for nearly four years until he settled his abatement case.[6] 4-ER-728. The

---

[6] In its assessment of the facts, the court ignored this massive delay and described the County as issuing a "there-and-then" permit that "was accepted and granted that very day." 1-ER-49. Even the County acknowledged the delay and refunded Blu the fees it incurred prosecuting him for four years after it should have granted his permit. 3-ER-353-59.

County confirmed it had not issued Blu's permits because of its policy against granting any permits to properties facing abatements. *Id.*

These facts, properly credited, support Plaintiffs' broader allegation that the County has a policy of denying permits—both remedial and non-remedial—to properties under cannabis-related abatement orders.

Legally, the trial court determined facts can be unripe by over-reading cases that require a final decision before a plaintiff can challenge a specific permit denial. 1-ER-32-33 (citing *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), and *Kinzli v. Santa Cruz*, 818 F.2d 1449 (9th Cir. 1987)). Those cases involved claims that the denial of a land-use permit was itself a taking before the government denied the permit. Plaintiffs' claims, by contrast, don't challenge any particular permit denial. Instead, they challenge an overall procedure designed to coerce settlements, only one aspect of which is the categorical exclusion from permitting for people who don't settle. The County's ongoing application of that policy to Plaintiffs is one source of their due-process injuries and how the County coerces unconstitutional conditions. Plaintiffs' claims about the harm they're currently suffering are ripe for review. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 85 (1972) (A "nonfinal deprivation of property" is still a

deprivation.).  The trial court's misappropriation of the ripeness doctrine to ignore allegations relating to otherwise ripe claims was an error of law.

* * *

The court's improper construction of facts at the motion-to-dismiss stage infected its entire opinion.  The frustrating irony is that the court consistently supported its refusal to credit Plaintiffs' allegations with little more than strings of adjectives and conclusory statements—the exact thing it claimed Plaintiffs did wrong—rather than providing the specificity that the law requires from the court at the 12(b)(6) stage.  These decisions were erroneous and a resounding abuse of discretion.

## B. When Their Allegations Are Credited, Plaintiffs Stated Five Claims for Relief

### 1. The County's Cannabis-Related Abatements Violate Procedural Due Process

Plaintiffs alleged that the County's cannabis-abatement program violates due process because it gives landowners no choice but to pay the County to end the enforcement, regardless of their guilt.  A system designed to take people's money without evidence of wrongdoing or a meaningful opportunity to be heard will inevitably deprive people of property erroneously.

The Due Process Clause ensures a fair decision-making process to prevent "substantively unfair and simply mistaken deprivations of property[.]" *Fuentes*, 407 U.S. at 81-82. When the government acts to deprive someone of a protected interest, it must afford an opportunity to be heard "at a meaningful time and in a meaningful manner." *Orloff v. Cleland*, 708 F.2d 372, 379 (9th Cir. 1983). A hearing is "meaningful" only if its time and manner mitigate the risk of erroneous deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

To determine whether the opportunity to be heard is constitutionally sufficient, courts balance the three *Mathews* factors: "the private interest that will be affected, the risk of erroneous deprivation of that interest through the procedures used, and the fiscal and administrative burdens that any additional procedural requirements would entail." *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 778-79 (9th Cir. 1982).

### a. Plaintiffs' Interests Are Substantial

The interests at stake in the challenged enforcement actions are massive. Plaintiffs face millions of dollars in fines and fees, costly demolition orders, and the categorical exclusion from land-use permits while their property is under an abatement order. Their exposure increases as time passes: more fines accrue, the failure to immediately abate an issue

limits their chance to have fines reduced on appeal, and each day they can't obtain permits deprives them of the full use and enjoyment of their property. *Fuentes*, 407 U.S. at 80-81 (The purpose of due process "is to protect [the] use and possession of property from arbitrary encroachment— to minimize substantively unfair or mistaken deprivations of property[.]"); *Harris v. Riverside Cnty.*, 904 F.2d 497, 503 (9th Cir. 1990) (landowner had a property interest in use and enjoyment of his land).

With so much at stake, the County must provide procedural safeguards to avoid mistakenly depriving landowners of their property rights.

### b. The Abatement Procedures Almost Guarantee Erroneous Deprivation

As Plaintiffs alleged, the risk of erroneous deprivation begins before the County ever issues an NOV and is compounded for years while the County delays hearings. The constitutionally deficient procedures fit into four categories: (i) the County's disinterest with guilt; (ii) deficiencies in notice; (iii) indefinite delays; and (iv) prohibitive costs. Taken together, these features leave innocent people little choice but to pay the County. *See Walters v. Reno*, 145 F.3d 1032, 1042 (9th Cir. 1998) ("[A]ny one of the factors alone might be insufficient to create a due process violation, [and]

the combination of factors ... produces a high likelihood" of erroneous deprivation.).

### i. The County Prosecutes People Without Probable Cause

The County issues cannabis-related NOVs and penalties without a process to ensure it has probable cause to believe that an accused landowner violated the code to grow cannabis.  Typically, the County bases cannabis-related penalties solely on satellite images that cannot reveal whether violations exist to cultivate cannabis.  4-ER-698-700, -736.  Yet the County does not visit the property or investigate further to confirm there's cannabis before it charges Category 4 offenses based on a nexus to cannabis. 4-ER-700, -724, -736.  The lack of subsequent investigation leads the County to charge plenty of innocent people.  4-ER-699-700, -723, -729-33.

Receiving an NOV brings immediate and unavoidable costs.  The daily fines accrue after just 10 days and can be reduced in only limited circumstances.  4-ER-693, -709, -713.  And the County charges fees for the cost of its mistaken prosecutions, even if it dismisses the case.  4-ER-703-04. Additionally, an abatement order prevents the recipient from obtaining *any* permits for their property during the enforcement action.  *See supra* section II.A.3; 4-ER-693, -711-12, -718.

The trial court, for its part, incorrectly rejected the idea that imposing costs without probable cause even implicates due process. 1-ER-40.

What standard of proof applies is "a societal judgment about how the risk of error should be distributed[.]" *Santosky v. Kramer*, 455 U.S. 745, 755 (1982). Bringing charges on a lesser standard of proof increases the risk of doing so mistakenly. That risk of error makes the standard of proof relevant to the *Mathews* analysis. *See id.* at 764 (holding that the standard of proof helped create a "significant prospect" of erroneous deprivation); *United States v. $49,576.00 U.S. Currency*, 116 F.3d 425, 428 (9th Cir. 1997) ("[O]ne such safeguard is the imposition of a heightened burden of proof on the government."). The County charging cannabis-related offenses without probable cause creates a substantial risk its charges are "mistaken." *FDIC v. Mallen*, 486 U.S. 230, 242 (1988).

Charges that impose interim deprivations exacerbate the risk of error. Typically, the government cannot deprive someone's rights prior to a hearing unless "it has satisfactorily established probable cause" and the post-deprivation review is *prompt. Barry v. Barchi*, 443 U.S. 55, 64 (1979) (horse trainer's suspension without prompt hearing violated due process). A penalty should not attach before the government is "put to its proof." *Mallen*, 486 U.S. at 246. To satisfy due process, pre-deprivation procedures

must "provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be." *Yagman v. Garcetti*, 852 F.3d 859, 864-66 (9th Cir. 2017). An interim deprivation must be supported by "[a]n important government interest" and "a *substantial assurance* that the deprivation is not baseless or unwarranted." *Mallen*, 486 U.S. at 240 (emphasis added); *Stypmann v. San Francisco*, 557 F.2d 1338, 1343 (9th Cir. 1977) (towing violated due process, in part, because there was "no procedure to assure reliability of the determination that the seizure and detention [we]re justified"); *see also Ingram v. Wayne Cnty.*, 2023 WL 5622914, at *13 (6th Cir. Aug. 31, 2023) (Unlike vehicle seizures after a failed breathalyzer, "the ad hoc seizure of vehicles based on proximity to areas where a crime may have occurred presents a high risk of erroneous deprivation, without any similar assumption that officers can accurately predict culpability."). The County's procedures fail to ensure its cannabis-abatement orders are reliable.

To make matters worse, the County ignores evidence of its mistakes. 4-ER-707, -732. Despite instructing landowners to send a picture inside a greenhouse with the day's newspaper, the County does not drop the charges or stop the accrual of fines when someone shows they weren't growing

cannabis. 4-ER-707. That continued indifference to the reliability of its charges compounds the risk of erroneous deprivation. *See Galfer v. Los Angeles*, 2015 WL 13917043, at *12-13 (C.D. Cal. Mar. 6, 2015) ("[A] policy of failing to consider evidence capable of rebutting the prima facie case created by the traffic officer's statements in a facially valid citation" increased the risk of erroneous deprivation); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1152-54 (D. Or. 2014) (no-fly list had "a high risk of erroneous deprivation in light of the low [reasonable-suspicion] standard required for placement" and "the lack of a meaningful opportunity ... to provide exculpatory evidence" to get off the list).

The lack of procedures to ensure that the County bases its cannabis-related penalties on proof that an accused grew cannabis gives rise to a due-process claim.

### ii. The NOVs Do Not Provide Adequate Notice

When the County issues a cannabis-abatement order, the NOV obscures when the 10-day abatement clock begins to run and what the landowner must do to comply. 4-ER-703. The County pre-dates NOVs and posts them by the property line, typically on a Friday, so that when the owner finds it, there seems like there's no time left to comply. *Id.* The notice

also doesn't specify which structure or portion of the property is in violation. 4-ER-716, -722, -735-36.

Although the trial court did not address these allegations, they stated a due-process claim. Notice of a violation must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The information on the notice is "critical" to the opportunity to be heard because it apprises the accused of the charges and allows them to prepare a defense. *Wright v. Beck*, 981 F.3d 719, 727 (9th Cir. 2020).

Generally, the notice must explain in clear terms how the accused violated the law and how to raise a defense. *Walters v. Reno*, 145 F.3d 1032, 1042 (9th Cir. 1998). There must be enough factual detail for the accused to understand "the precise nature of the charges." *In re Ruffalo*, 390 U.S. 544, 552 (1968); *Stine v. Ariz. Dep't of Corr.*, 937 F.2d 613 (9th Cir. 1991) (unpublished) (plaintiff stated a procedural-due-process claim because "the notice he received did not describe any of the facts underlying the alleged infractions").

The NOVs leave an accused in the dark about what structure or portion of their property the County thinks has a nexus to cannabis. Nor do

they explain when the 10-day compliance clock begins to run or how to stop the fines. Even a "short and simple explanation" of the specific violation and how to respond would give recipients "a small measure of clarity" about what they must do to protect their rights. *See Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1194 (9th Cir. 2015). The NOVs' failure to include any violates due process.

### iii.   The County Delays Hearings Indefinitely

The County delays administrative appeals indefinitely when it lacks evidence to support its charges. 4-ER-710. Rather than just dropping its baseless cases, the County will reach out periodically and push a settlement agreement in lieu of the hearing. 4-ER-693, -708, -710, -715. If the landowner rejects the offer, the County puts their appeal back on the shelf.

Blu first requested his hearing in May 2018. 4-ER-723. Over the next four-and-a-half years, the County made (and Blu refused) at least six settlement offers. 4-ER-723-27. Each time, the County refused to honor his request for a hearing until September 2022 when, conspicuously, Blu was preparing to sue. 4-ER-727.

Cyro requested a hearing in November 2018. 4-ER-735-36. He heard nothing until May 2021 when the County sent a settlement offer. 1-ER-42. The County still hasn't scheduled his hearing. 4-ER-736-37.

Rhonda requested a hearing in October 2020. 4-ER-732. When she refused to settle, the County issued a new NOV to increase the pressure. 4-ER-733-34. She requested a hearing again in April 2022, but the County still hasn't scheduled one. 4-ER-734.

The Thomases requested their hearing in September 2021. 4-ER-717. After their settlement negotiations ended in April 2022, the County still hasn't scheduled their hearing. 4-ER-719-22.

The timeliness of hearings was the only procedural-due-process allegation the trial court really considered. 1-ER-40. But even 4.5-year delays were not enough to sway the court. In its view, the "Plaintiffs themselves have occasioned most of the delay" by either talking to the County too much or too little. 1-ER-41. The court described Blu's repeated insistence on a hearing as "back-and-forth settlement negotiations" that caused the County's delay. 1-ER-41-42. Cyro, on the other hand, "equivocat[ed]" by *not* responding to the County's offer. 1-ER-42. In other words, whether Plaintiffs responded to the County's settlement offers or not, the court blamed Plaintiffs for the delay. That construction of facts violated the motion-to-dismiss standard. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("If there are two alternative explanations, one advanced by defendant and the other advanced by

plaintiff, *both of which are plausible*, plaintiff's complaint survives[.]").  To make things worse, the trial court faulted Plaintiffs for working to remedy their violations when doing so is the only way to be eligible for a fine reduction on appeal.  4-ER-713.

Properly construed, Plaintiffs plausibly alleged that the endless delay in scheduling appeal hearings increases the likelihood of erroneous deprivation.  The Supreme Court has used the speedy-trial factors to inform whether an undue delay in scheduling a hearing violates due process: (1) length of delay, (2) the reason for delay, (3) when Plaintiffs asserted their rights, and (4) the prejudice the delay caused.  *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 564-65 (1983).

The delays in some of Plaintiffs' cases exceeded four years before they sued and exceeded five years for some members of the proposed class.  Each Plaintiff and member of the proposed class filed a timely notice for an appeal hearing.  There's no legitimate governmental interest for the delay, as the County asserts that it has all the evidence it needs before it issues a cannabis-abatement order.  4-ER-708.  The sole reason for the delay is that the County doesn't schedule hearings when it can't prove its case, yet it needs the outstanding charges to maintain its leverage.  4-ER-710.  This use of delays to manufacture leverage prejudices Plaintiffs.  4-ER-708-11.  And

their ineligibility for land-use permits while they wait only increases that prejudice.

A hearing "which takes places months or years" after the government restrains the full use and enjoyment of someone's property creates a "high" risk of erroneous deprivation and "cannot be construed as a hearing provided 'at a meaningful time.'" *United States v. Crozier*, 777 F.2d 1376, 1383-84 (9th Cir. 1985).

### iv.    Challenging an Abatement Order Is Cost Prohibitive

The County compounds the risk of error by making appeals financially unviable.  Filing an appeal does not stay the accrual of fines, and county law makes people incur at least five days of fines before they're entitled to a hearing.  4-ER-708-09.  In practice, though, the County lets the full 90 days of fines accumulate.  4-ER-709.

An appeal hearing adds more costs.  The County can "prevail" in an appeal when a landowner proves they're innocent of cannabis cultivation. As county officials warned Blu, he would have to pay 90 days of fines for his underlying grading violation—even though County policy prevented him from abating the violation before the fines accrued because it falsely accused him of growing cannabis.  4-ER-728.  Any landowner who committed a permitting violation unrelated to cannabis must incur tens of thousands of

dollars in penalties and $4,500 in fees to prove they never grew cannabis (and thus aren't subject to millions in fines). 4-ER-709, -715. These prohibitive costs to proving one's innocence of cannabis growth make paying to settle a baseless charge the only logical thing to do.

Just as a notice requirement may fail to provide due process, a cost requirement may also foreclose a party's opportunity to be heard. *Boddie v. Connecticut*, 401 U.S. 371, 380 (1971). Although the government may impose reasonable filing fees, it cannot thrust someone into a judicial process, put their fundamental rights at stake, and then make that process unaffordable. *See Wiren v. Eide*, 542 F.2d 757, 763-64 (9th Cir. 1976) (filing fee in forfeiture case denied due process); *cf. Angelotti Chrio., Inc. v. Baker*, 791 F.3d 1075, 1083 (9th Cir. 2015) (costs don't violate due process when "plaintiffs have not been 'thrust' into the judicial process" and don't need the hearing).

The County charges cannabis-related violations without probable cause and then forces landowners to pay thousands—if not tens of thousands—of dollars to prove they never grew cannabis. By making settlement the only financially viable option, the cost of the appeal process helps ensure that the County will deprive innocent people of their property.

### c. The County Has No Legitimate Interest in Its Insufficient Processes

Neither the motion to dismiss nor the opinion below claimed that the County had an interest in its deficient procedures. "The only government interest at stake is that of avoiding the inconvenience and expense of a reasonably prompt hearing[.]" *Stypmann*, 557 F.2d at 1343. "[A]n early and reliable determination" of its claims would serve the County's interest in enforcing land-use regulations. *See Barchi*, 443 U.S. at 66.

### 2. The County's Indifference to Innocence Violates Substantive Due Process

In assessing Plaintiffs' substantive-due-process claim, the trial court again ignored their allegations and misconstrued their claim. Properly construed, Plaintiffs stated a claim that the County's policy of issuing cannabis-enhanced penalties with indifference to whether a landowner grew cannabis violates substantive due process in two ways. *First*, the County charges people with cannabis-related violations regardless of whether they grew cannabis. No legitimate government interest supports this arbitrary deprivation of rights. *Second*, as the County admits, it punishes new purchasers for prior owners' cannabis growth even though

any cannabis was gone before they purchased the property. There is no governmental interest in punishing people for someone else's conduct.

### a. The Court Misconstrued Plaintiffs' Claim

The district court completely ignored that the Category 4 penalties at issue are based on cannabis, focusing instead on whether the County investigated the underlying permitting violations—none of which are at issue in this case. *See* 1-ER-44. Based on its misreading of the FAC, the court determined that Plaintiffs failed to establish a substantive-due-process violation because they had at least constructive knowledge of the underlying violations and because the County investigated the underlying violations. 1-ER-46-48.

The court's analysis was, at best, purposefully obtuse. Plaintiffs stated clearly that they were being punished for cannabis-related violations, 4-ER-709, -725, -745-46, which subjected them to different rules and punishments. 4-ER-695, -706. Nevertheless, the court ignored this distinction and called Plaintiffs "highly disingenuous" for alleging that the County didn't investigate the underlying permitting issues. 1-ER-47. But what Plaintiffs alleged is that the County imposes Category 4 penalties "for activity unrelated to cannabis like having a greenhouse or rainwater-catchment unit" without "probable cause to believe those landowners have

violated the code for the purpose of cultivating cannabis without a permit."
4-ER-746. The court's failure to recognize that distinction rendered its substantive-due-process analysis inapposite.

### b. The County Cannot Punish People Without Probable Cause

The government has no legitimate interest in penalizing people without evidence or an adequate investigation. The founders adopted Magna Carta's concept of due process "to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819). Due process prohibits land-use policies that are arbitrary, irrational, unreasonable, or fail to serve any legitimate governmental interest. *N. Pacifica LLC v. Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008).

Although the government may in some instances charge someone on a lesser showing of proof, charges that impose an immediate restraint on liberty require probable cause. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 124-25 & n.26 (1975) (explaining that criminal charges must be based on probable cause if they impose a restraint on liberty before trial). Even charges that don't immediately restrain rights still violate due process if the "failure to

investigate was intentional or reckless, thereby shocking the conscience." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) (citation omitted); *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) (systemic failure to investigate).

Plaintiffs alleged that the County has a policy of issuing cannabis-related abatement orders without probable cause to suspect illegal cannabis cultivation. 4-ER-697-702. They supported this claim with more specific allegations: The County relies on satellite images that cannot reveal the presence of cannabis or purpose of a code violation, 4-ER-698-700; it does not visit these properties because it does not have probable cause to do so, 4-ER-700-01; and its reliance on satellite images has led it to mistake plenty of innocent conduct for cannabis growth. 4-ER-699, 723.

To dial up the arbitrariness, the County won't drop charges when faced with exculpatory evidence. 4-ER-693. *Miller v. Vazquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."). Once charged with a cannabis-related violation, there is no way out without paying the County— even when the County has falsely charged someone due to its failure to investigate. 4-ER-707-08. As Plaintiffs alleged (4-ER-704, -746), a cannabis-related NOV imposes an immediate cost: Landowners under an

abatement order accrue fines and fees, cannot obtain permits to develop their property, 4-ER-711, face immediate reputational harm due to the County publishing its baseless sanctions, and must then pay for the cost of their own prosecution even if the County drops the charges. 4-ER-703-04.

A system concerned with punishing innocent people doesn't charge people without probable cause, prohibit them from developing their property while they wait indefinitely for a hearing, and "scare the[ir] panties off" with millions in fines. Humboldt County's indifference to innocence is wholly arbitrary and divorced from any legitimate governmental interest.

### c. Due Process Prohibits Punishing Innocent People

Due process also protects the right to not be penalized for someone else's crimes—a principle embedded in this nation's history and legal traditions since the founding. The "basic concept" of our legal system is that "legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972); *Colbert v. Chicago*, 851 F.3d 649, 659 (7th Cir. 2017) ("[P]roximity to a wrongdoer does not authorize punishment."). Imputing someone else's guilt onto an innocent person is "contrary to fundamental principles of our justice system." *See United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998). Indeed, "[s]ubstantial Supreme Court authority" confirms that

"predicating punishment only upon personal guilt" is a "fundamental" right. *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974).

The County's cannabis-abatement program violates this fundamental concept by punishing innocent purchasers for their predecessors' conduct. The court below tried to skirt this problem by focusing on the underlying permitting issues. Ignoring Plaintiffs' allegations that cannabis allegations drove their prosecution and penalties, the Court declared that it was "a mischaracterization" to say that the NOVs "impose penalties for past illegal *conduct* – and not just the continued existence of a nuisance." 1-ER-47. Remarkably, the court insisted that "a great many of the code violations at issue in this case were unrelated to any notion as to whether or not these Plaintiffs (or even their predecessors in interest) were or were not actively cultivating cannabis on the property." 1-ER-44. While it's true that Plaintiffs did not cultivate cannabis, the County still punished them as if they did.

Plaintiffs' claim is that the County fines people who haven't grown cannabis for cannabis-related offenses and is indifferent to their innocence. The FAC sets out how the County imposes these penalties on new purchasers as punishment for a prior owner's cultivation. 4-ER-701, -706. The Thomases, Rhonda, and Cyro all received NOVs with cannabis penalties

for prior owners' conduct. None of the violations were recorded against the property to give them notice, as required by county law. 4-ER-702, -730. And none of this is by mistake. 4-ER-707. County officials knew that Rhonda did not commit the violations and that many no longer exist or pose any harm to the community. 4-ER-733. Yet the County still fined her millions of dollars because she hadn't "voluntarily" complied with all its demands. 4-ER-734. Similarly, the County fined the Thomases for cultivation even though the County removed the prior owner's cannabis operation two years before the Thomases bought the property. 4-ER-717.

The County tries to excuse its unconstitutional program by proclaiming that landowners are responsible for the conditions on their property. But the NOVs don't just order them to correct conditions or obtain as-built permits for unpermitted structures that came with their property—they impose penalties for past *conduct*. In contrast to whatever anodyne system the County would rather defend, the one it's enforcing against Plaintiffs punishes them for someone else's cannabis growth. It issues Category 4 penalties for personal conduct without regard for personal guilt in contravention of Plaintiffs' fundamental rights and this Nation's scheme of ordered liberty.

The trial court saw things differently, though. According to the court, the County has no interest in "lining its pockets with [the] penalty money" it charges. 1-ER-48. Instead, its interest in assessing these exorbitant penalties, as the court saw it, "is clearly meant to be coercive in order to induce speedy compliance with abatement orders." *Id.* The government has no legitimate interest in punishing people for their predecessors-in-interest's conduct—even if the fines are just meant to coerce them into settling for a smaller sum.

### 3. The County Uses Unconstitutional Conditions to Coerce Settlements

Plaintiffs also stated a claim under the unconstitutional-conditions doctrine. The County uses its categorical denial of permits to coerce people who need permits unrelated to their abatement case into paying the County a settlement, waiving their right to a hearing, and waiving their Fourth Amendment rights in perpetuity. 4-ER-721-23, -726-29. Plaintiffs and the proposed class must choose between forgoing non-remedial permits and waiving their rights related to their abatement case.

The government may not deny someone a benefit because they're exercising a constitutional right; nor may it use the threat of denial to pressure an applicant into something that it couldn't constitutionally order

them to do.  *Koontz*, 570 U.S. at 604, 608, 612.  The "unconstitutional conditions doctrine ... vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  *Id.* at 604.  The doctrine broadly prohibits the government from making extortionate demands to pressure people into giving up their rights in exchange for a discretionary benefit.  *Id.* at 604-05; *see also Ballinger v. Oakland*, 24 F.4th 1287, 1299 (9th Cir. 2022) ("[T]he doctrine ... is broader than the exactions context.").

An extortive demand to exchange a right for a benefit is unconstitutional regardless of whether the victim accedes.  *Koontz*, 570 U.S. at 606, 619.  To determine if a condition is unconstitutional, courts look *first* to "whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted[.]" *Dolan v. Tigard*, 512 U.S. 374, 386 (1994) (citation omitted).  Demands unrelated to a permit are "an out-and-out plan of extortion."  *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987).  The *second* step is to assess the proportionality of the demand to determine if it "bears the required relationship to the projected impact" on the individual.  *Dolan*, 512 U.S. at 388.  It's the government's burden to prove its demand relates to the payment it's attempting to exact.  *Id.* at 395-96.

Plaintiffs stated a claim that the County imposes unconstitutional conditions on landowners with pending abatement orders who seek permits *unrelated* to their abatement case. The court below completely misunderstood the claim, limiting its analysis to whether any Plaintiffs submitted a "remedial permit application" and whether the settlement conditions were related and proportionate to that remedial permit.[7] 1-ER-49-52.

Contrary to the district court's mischaracterization, Plaintiffs' claim focused on the conditions the County places on *non*-remedial permits. Plaintiffs alleged that the County uses its blanket refusal to issue permits to extort people into waiving several rights unrelated to the permit. 4-ER-711-12, -714. In exchange for a non-remedial permit, the County demands that landowners waive their right to be heard on their abatement case and their right against warrantless searches, and it requires them to pay a settlement unrelated to the permit. *E.g.*, 4-ER-721-23.

In Blu's case, for instance, the County wouldn't grant him a permit for his home until he settled his unrelated abatement case.[8] 4-ER-727. After

---

[7] Again, the court ignored well-pleaded facts when it said that Blu's permit application "was accepted and *granted* on the spot." 1-ER-49; *supra* n.5.
[8] The trial court suggested that Blu forfeited all his claims by settling his case. 1-ER-42. That legality of that settlement is directly at issue in Count

Blu paid $799 for a Safe Home permit, Code Enforcement put a "hold" on his permit that they would release only if Blu paid $3,747.29 (later reduced to $795.92) to settle his unrelated abatement case. 4-ER-726-29. In other words, the County "specifically identified" that it wanted Blu's "payment of money in exchange for granting a benefit to [his] parcel of land[.]" *Ballinger*, 24 F.4th at 1297. The "only reason" Blu agreed to pay the County a settlement agreement "was because the County was holding hostage the permits Blu needed for his property." 4-ER-729.

Similarly, Rhonda contacted the County about permits to start building a home on the land that she purchased to develop. 4-ER-730. The County responded that "no permits will be issued for properties with open Code Enforcement cases." 4-ER-733. Unless she gives in and settles in her unrelated abatement case—under an agreement that waives her due-process, Fourth Amendment, and property rights—she will remain ineligible for the permits she needs.

Because there is no nexus between the settlement demands and the non-remedial permits, and because the settlement cost is disproportionate

---

III. And Blu retains viable claims for nominal damages for violations of his due-process rights. *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978).

to the separate cost for a permit the landowner must still pay, these conditions are unconstitutional. *See Dolan*, 512 U.S. at 386, 388, 395.

### 4. Excessive Fines Fuel the County's Cannabis-Abatement Program

Plaintiffs stated a claim that the penalties for cannabis-related permitting issues violate the Excessive Fines Clause of the Eighth Amendment. The court below did not address the merits of this claim. Instead, the court ruled that Plaintiffs' claim was not yet ripe and dismissed the claim with prejudice to ensure that they could never raise it. 1-ER-31. The court's ripeness determination was wrong and failed to consider the body of law on which Plaintiffs relied.

### a. Plaintiffs Can Challenge the Fines They've Accrued

The County's cannabis-abatement system is atypical, and that's led to some confusion about how the law applies. Prior to legalization, a landowner got 30 days correct a nuisance voluntarily and another 30 days under an abatement order, at which point the County had to schedule a hearing to impose a penalty. 4-ER-695-66. Following legalization, however, the County combined everything into a single step by a single Code Enforcement agent, so that fines now run automatically 10 days after an abatement order. County law now vests Code Enforcement officers with the

authority to determine the fine amount and impose that fine. *See* Humboldt County Code ("HCC") §§ 352-3(i); 352-6(b). "[T]he imposition of administrative civil penalties" now "start[s] to accrue after service of [an NOV]." *Id.* § 352-3(m)(2) ("Imposition Date"). The fine is then final and a landowner can either pay—through a settlement or judgment lien (4-ER-715, -723)—or appeal. HCC § 352-2(b)(2) (describing the administrative hearing as "a process to appeal the imposition of such administrative penalties").

Once on appeal, the law limits the hearing examiner's discretion to reduce the fines unless the accused "immediately remedied a violation"—something abatement victims can't do given the County's blanket policy against issuing permits to properties with open cases. 4-ER-709, -711, -713. And beyond that, the ordinance sets a minimum fine at $6,000 per day per violation. 4-ER-695. So, the code severely curtails the hearing examiner's ability to reduce a fine, making the sum Plaintiffs will have to pay relatively certain.

Plaintiffs raised two purely legal claims on a class-wide basis against the fines the County has already assessed: (1) the $6,000-$10,000 statutory range for Category 4 penalties is facially unconstitutional for permitting violations with a nexus to cannabis and (2) *any* cannabis-based penalty is

unconstitutionally excessive as applied to someone did not cultivate cannabis.

The trial court held that Plaintiffs lack standing to challenge the fines they've accrued because "no party has actually paid a fine." 1-ER-30. But Article III standing does not require "the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). A plaintiff can seek redress once there's a "credible threat" that the government will enforce the challenged law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The "no ripeness until you pay" rule that the court created is essentially an exhaustion requirement. *Cf. Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite[.]"). But the existence of state-law remedies doesn't displace the federal courts' authority to rule that the Excessive Fines Clause prohibits a penalty as a matter of law.

The Eleventh Circuit articulated the ripeness standard that most courts follow in cases challenging penalties: Eighth Amendment claims are "generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Cheffer v. Reno*, 55 F.3d

1517, 1523-24 (11th Cir. 1995) (plaintiffs who were never charged could not challenge a penalty that a judge had full discretion to reduce).

Cases applying this standard establish that a challenge to the constitutionality of a penalty ripens when the court can ascertain what penalty the government will impose. *See Duffner v. St. Peters*, 930 F.3d 973, 977 (8th Cir. 2019) ("Because it is unknown whether the City will impose sanctions on Duffner or, if sanctions are imposed, what they might be, Duffner cannot establish that her claim is 'fit' for judicial decision."); *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 705 (7th Cir. 2011) (excessive-fines claim ripened when Sierra Club asked the court to impose the challenged penalty); *United States v. Jones*, 731 F. Supp. 2d 1275, 1280 (M.D. Fla. 2010) (indictment, not conviction, ripened claim against mandatory minimum); *see also Joseph v. Koh*, 2020 WL 5408042, at *12 (N.D. Cal. Sept. 9, 2020), *R&R adopted*, 2020 WL 5824491 (N.D. Cal. Oct. 1, 2020) (granting plaintiff leave to clarify whether fines were "imposed, or merely threatened").

Plaintiffs are beyond the mere threat of enforcement. The County has assessed their penalties already. If the County had a more typical abatement system, the result might be different. In a recent Sixth Circuit case, for instance, the plaintiffs challenged a penalty provision after the city ordered

them to abate a landscaping violation. *Stevens v. Columbus*, 2022 WL 2966396, at *3 (6th Cir. July 27, 2022). The court dismissed their Excessive Fines claim "for the simple reason that the City has yet to impose or seek any fine against them"; the action the city filed sought "only injunctive relief to get the party in compliance"—not the "'payment of any fines.'" *Id.* at *12. If the city did eventually "seek fines for failure to remove the alterations to the landscaping," however, the Sixth Circuit reasoned that the plaintiffs "would have a ripe challenge." *Id.*

That counterfactual is this case. Plaintiffs aren't complaining about the eventual prospect of a fine—the County has issued it already. *Cf. Club Madonna, Inc. v. Miami Beach*, 924 F.3d 1370, 1381 (11th Cir. 2019) (Eighth Amendment claim is unripe until the government issues a fine or is about to do so); *Beatty v. Tong*, 2023 WL 2384111, at *12 (D. Conn. Mar. 6, 2023) (prisoners cannot challenge pay-to-stay punishment until Connecticut chooses to enforce it against them).

To be sure, whether a court (or hearing officer) may reduce a penalty is a prudential concern. But the hearing examiner's limited capacity to do so reduces the need to speculate about the law's enforcement. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 141-43 (1974); *Traficanti v. United States*, 227 F.3d 170, 176 n.2 (4th Cir. 2000) ("No future

uncertainty exists as to the imposition of the [mandatory] penalty[.]");
*Laase v. Isanti Cnty.*, 638 F.3d 853, 858 (8th Cir. 2011) (Excessive Fines claim ripened while litigation was ongoing because the penalty applied automatically).  Code Enforcement has already determined how much to penalize Plaintiffs.  *Cf. 18 Unnamed "John Smith" Prisoners v. Meese*, 871 F.2d 881, 882-83 (9th Cir. 1989) (pre-enforcement challenge to double-bunking policy unripe because potential negative effects were still speculative and "require[d] further factual development").  Even if the hearing examiner *could* reduce the fine, the statutory minimum is still $6,000 per day, a sum Plaintiffs maintain is unconstitutionally excessive.

This Court recently rejected a ripeness challenge because a law made fines mandatory for certain conduct and limited the discretion to reduce them.  *Johnson v. Grants Pass*, 72 F.4th 868, 879 n.9 (9th Cir. 2023); *see also Blanchette*, 419 U.S. at 142 ("[T]he possibility that a court may later decline to enforce [a law] as written because of its unconstitutionality cannot constitute a contingency itself pretermitting earlier consideration of the constitutionality of the [law].").  The same standard allows the court to address Plaintiffs' claims.

Ripeness is also aided by Plaintiffs' raising purely legal issues that don't require further factual development.  4-ER-751-52.  *See Yahoo! Inc. v.*

*La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006) (en banc) ("Pure legal questions that require little factual development are more likely to be ripe." (cleaned up)). Courts considering ripeness assess "the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *see also Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1000 n.11 (9th Cir. 2007) (challenge to punitive-damage provision "easily satisf[ied] both prongs of the ripeness test" prior to plaintiff paying any money, "as the issues ... [we]re purely legal and delay w[ould] cause unnecessary hardship"). Plaintiffs' claims are purely legal; they assert that the Category 4 penalties they challenge are unconstitutional *in every instance*.

Finally, the hardship Plaintiffs face weighs against delaying judicial review. The main purpose of the County's excessive fines, as even the trial court recognized, is to "coerc[e]" people. 1-ER-48. Such life-altering penalties create significant leverage against the accused. "Without a clear understanding" of whether the penalty assessed is unconstitutionally excessive, Plaintiffs can't make an informed decision about settlement. *United States v. Ruiz-Villanueva*, 680 F. Supp. 1411, 1415 (S.D. Cal. 1988). The district court's ruling enables the government to use unconstitutional

penalties to coerce people into doing what it wants so long as it puts off collection. This Court should not permit the County to insulate from federal review purely legal challenges to its penalties by "simply delay[ing] making any final decision." *Safeway Stores, Inc. v. Haw. Bd. of Agric.*, 590 F. Supp. 778, 782 (D. Haw. 1984). Plaintiffs' challenge under the Excessive Fines Clause is ripe.

### b. The Fines Plaintiffs Accrued Are Unconstitutionally Excessive

The Eighth Amendment prohibits the government from imposing excessive fines. *Timbs v. Indiana*, 139 S. Ct. 682, 686-87 (2019); *Pimentel v. Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020). Dating back to Magna Carta, the government's economic sanctions have had to be proportionate "to the wrong" and not "so large as to deprive an offender of his livelihood." *Timbs*, 139 S. Ct. at 688 (cleaned up).

A penalty "must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Although there is no "'rigid set of factors'" to determine proportionality, this Court typically considers four: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and

(4) the extent of the harm caused." *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1121-22 (9th Cir. 2004) (citing *Bajakajian*).

### i. Category 4 Fines for Cannabis-Related Violations Are Facially Excessive

It is unconstitutionally excessive to impose Category 4 penalties for code violations that merely relate to "the commercial cultivation of cannabis in Violation of any applicable local or state laws … or to facilitate the illegal cultivation of cannabis." HCC § 352-3(h). Permitting violations that otherwise constitute Category 1 offenses, with a daily $1-$1,000 fine due to the minimal harm such offenses pose, increase automatically to Category 4 violations with daily fines of $6,000-$10,000 *solely* because the violation, at some point, had a nexus to cannabis. 4-ER-751.

The *Bajakajian* factors confirm the excessiveness of these penalties. *First*, looking to the nature and extent of the violation, the fines are completely disproportionate to the permitting offenses. At $6,000-$10,000 per day, just a few days of fines exceed the average yearly income in Humboldt. 4-ER-692, -705. The County imposes these enormous penalties without an individualized assessment of proportionality or culpability. It issues Category 4 penalties for cannabis-related violations even if the recipient never grew cannabis. Every penalty issued by a system

unconcerned with guilt is definitionally unrelated to culpability. *Cf.* *$100,348.00*, 354 F.3d at 1123 (Culpability "should be examined specifically, rather than examining the gravity of the crime in the abstract.").

The penalties are also unrelated to harm. Indeed, the County insists that Category 4 penalties are justified absent *any* harm. 4-ER-704. The disinterest in harm is reflected by the County applying Category 4 penalties for violations that pre-date cultivation—even when the person responsible for the permitting violation sold the land before someone else grew cannabis there. 4-ER-733.

*Second*, to the extent other crimes are relevant in a civil case, *see Pimentel*, 974 F.3d at 923, cannabis growth is punishable by a *separate* Category 4 penalty.

*Third*, the typical penalty for permitting violations like the ones at issue is $1-$1,000. 4-ER-695. And even then, the owner can avoid a fine by simply obtaining a permit—a privilege the County denies to people facing cannabis-related penalties. 4-ER-711. In addition to dramatically increasing the fine, the County also imposes a separate $10,000 fine for unpermitted cultivation. 4-ER-704-05, -751. Taken together, then, the County is double and triple counting fines that are already exponentially larger than fines for similar offenses. Even if unpermitted cultivation itself

justifies a $10,000 daily fine in a state that legalized cannabis, there is no legitimate justification for imposing separate and additional Category 4 penalties for violations related to cultivation.

*Finally*, the offenses at issue are either harmless or nearly harmless. 4-ER-706, -751. Building a greenhouse without a permit, for instance, deprives the County of "a couple hundred dollars" in permitting fees at most. 4-ER-705. *See Bajakajian*, 524 U.S. at 337 ("solely a reporting offense"). The Category 1 penalties that the County assesses for the *same exact* permitting violations without a nexus to cannabis reflect the harm to the community. A $6,000-$10,000 daily fine for conduct that is otherwise subject to a fine as little as $1, solely because cannabis is involved, is grossly disproportionate in every instance.

Rather than trying to redress some harm, the County applies this cannabis multiplier to generate revenue regardless of culpability, the gravity of the offense, or the harm to the community. 4-ER-704, -751. The County's use of Category 4 penalties for violations with a nexus to cannabis is facially unconstitutional.

## ii. The Penalties Are Excessive as Applied to Plaintiffs

### a. The Fines Are Grossly Disproportionate

At the very least, Category 4 penalties for cannabis-related offenses are unconstitutional as applied to innocent purchasers like the Thomases, Rhonda, and Cyro. These penalties are not limited to fines; they also include thousands in administrative fees, 4-ER-709-10, -713-14, plus treble permitting fees as a "penalty" for structures used in cannabis cultivation. 4-ER-706-07, -720-21. Any cannabis-related penalty is excessive for people who never grew cannabis.

*First*, the nature and extent of their "crime" is negligible since the Thomases, Rhonda, and Cyro did not grow the cannabis on their property or build or grade without a permit. 4-ER-701-02, -707, -717, -730-732, -735. They all purchased property with clear title, and the County then punished them for a prior owner's conduct. Any fine for innocent conduct is unconstitutionally excessive. *See Weber*, 406 U.S. at 175 ("[L]egal burdens should bear some relationship to individual responsibility or wrongdoing."); *Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997) ("[A] punishment imposed for no offense at all is, as a matter of mathematics, disproportionate."); *United States v. 2007 Honda Civic EX Sedan*, 2014 WL

4211203, at *5 (W.D. Wis. Aug. 25, 2014) (forfeiture for innocent owner "would be grossly disproportionate because she committed no offense.").

The County can make new owners abate ongoing nuisances that pre-exist their ownership, but it cannot penalize them for the reasons why someone else didn't get a permit. This case is not, as the trial court minimized, about the County trying to simply "bring[] non-compliant properties into compliance with its land use code." 1-ER-48. No Plaintiff contests the County's authority to require them to get permits for structures that were unpermitted at the time of purchase. There would not be a federal case if the County imposed Category 1 penalties on purchasers who wouldn't correct pre-existing violations. What Plaintiffs challenge is the County's imposition of Category 4 penalties based on someone else's conduct before they bought the property.

In addition to punishing someone else's code violations, the violations themselves are minor and would otherwise carry Category 1 penalties. *See $100,348.00*, 354 F.3d at 1122. The minimal harm to the community is reinforced by the fact that the County allowed these permitting violations to persist for years, through several changes in ownership. It punished these violations *only* because of their eventual nexus to cannabis. In Rhonda's case, for instance, the County issued Category 4 penalties for grading

violations that it knew a logging company committed decades before any cannabis growth. 4-ER-732. It was only because a subsequent owner (who also was not Rhonda) grew cannabis on an old logging flat that the County ordered Rhonda to hire an engineer, re-grade the land, and pay cannabis-enhanced fines for grading violations someone else committed for reasons unrelated to cannabis. 4-ER-733.

The *second* and *third* factors cut even more strongly in the innocent Plaintiffs' favor than for their facial challenge. *See supra* section II.B.4.b. No Plaintiff grew cannabis or faced criminal sanctions, and the permitting violations would carry a much smaller fine if not for cannabis.

*Finally*, the offenses at issue are either harmless or nearly harmless. 4-ER-706, -751. Plaintiffs face penalties for someone else's failure to obtain a permit. Those fines remain even after the offending structures no longer exist. Rhonda faces millions in penalties for what is now an empty field. 4-ER-730-31. No harm to the community justifies those penalties.

All four *Bajakajian* factors confirm that it is constitutionally excessive to impose cannabis-based penalty enhancements on people who didn't grow cannabis.

### b. The Demolition Orders Are Also Excessive Penalties

The County also issues punitive orders requiring landowners to "return the land to its pre-cannabis state" by destroying structures and grading that they'd be able to permit if not for the prior connection to cannabis. For the same reason the fines are excessive as applied to innocent purchasers, these penalties are also unconstitutionally excessive.

The Excessive Fines Clause applies to any punitive economic penalty. *Cf. Timbs*, 139 S. Ct. at 689 ("[C]ivil *in rem* forfeitures fall within the Clause's protection when they are at least partially punitive."). "The purpose of the Eighth Amendment, putting the Bail Clause to one side, was to limit the government's power to punish." *Austin v. United States*, 509 U.S. 602, 609 (1993). "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *Id.* at 610.

As this Court recognized in *Wright v. Riveland*, monetary sanctions designed to punish (*i.e.*, those that "serve the purpose of retribution or deterrence") are "subject to Eighth Amendment scrutiny." 219 F.3d 905, 915 (9th Cir. 2000). When the government inflicts a cost to punish people—as opposed to any retributive or remedial goal—the punishment must be proportionate to the offense. *See id.* at 915-16.

The trial court, however, held that the County's demolition orders simply required "landowners to conform their property to a non-illegal use," which "'serve[] purely remedial purposes,'" making it implausible that the orders violate the Eighth Amendment. 1-ER-29-30.

While a typical abatement order might serve a remedial purpose, Plaintiffs plausibly alleged that the County's demolition orders serve to punish and deter unpermitted cannabis cultivation—not a health-and-safety function. 4-ER-702, -706, -717-20. *See Austin*, 509 U.S. at 620 ("Congress has chosen to tie forfeiture directly to the commission of drug offenses."). The demolition order applies regardless of the structure's permit-ability "simply because cannabis may have once been cultivated on the land—even when it was a prior owner or trespasser who grew the cannabis." 4-ER-706. If cannabis were not involved, the County would not automatically require a landowner to destroy an unpermitted structure. Indeed, the County told Rhonda that normally timber flats are permitted, "but the moment they are used for unpermitted cannabis cultivation they will need to be addressed by a licensed engineer." 4-ER-733.

Because these demolition orders are purely punitive—to impose additional costs on people with cannabis-related violations—the orders must be proportionate to the harm alleged. *See Bajakajian*, 524 U.S. at 332.

Ordering innocent purchasers to pay thousands in fees and destroy permittable structures because of a prior owner's past use of the structure imposes a disproportionate cost. For example, it would cost the Thomases $180,000 to demolish their workshop as punishment for someone else growing cannabis inside before they owned it. 4-ER-719.

The County's punitive demolition orders are also unconstitutionally excessive as applied to innocent purchasers.

### 5. The Seventh Amendment Applies to Civil Penalties

Count V alleged that the County's failure to provide a jury at the hearings challenging abatement fines violates the Seventh Amendment. Plaintiffs conceded that Circuit precedent forecloses their argument that the Seventh Amendment applies to the County, but they still preserved the issue for appeal.

Unsatisfied with Plaintiffs' "limited concession," however, the court below ruled on the merits of the jury-right claim. According to the court, "Humboldt County's code-enforcement regulatory framework clearly fits into the [public-rights] rubric, and that it expressly provides for full-fledged judicial review after the conclusion of the administrative phase of the proceedings." 1-ER-35-36.

It remains true that this Court's selective-incorporation precedent forecloses Plaintiffs' Seventh Amendment claim, which Plaintiffs continue to preserve for review by either the *en banc* court or, eventually, the Supreme Court.  But if this Court were to recognize that states and municipalities are bound by the Seventh Amendment, just as with other fundamental rights, Plaintiffs would be entitled to a jury in the County's case to impose millions of dollars in penalties.

The Seventh Amendment guarantees the fundamental right to a jury in all common-law suits for more than $20.  A suit at common law "refer[s] to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citation omitted).  Such suits include "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Id.*

The Supreme Court has already concluded that the Seventh Amendment applies when the government seeks damages for environmental nuisances.  *See Tull v. United States*, 481 U.S. 412, 418-25

(1987).  Historically, suits for civil penalties were "a particular type of an action in debt, requiring a jury trial."  *Id.* at 418-19 (collecting cases).  And more importantly, "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law."  *Id.* at 422.  "Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity."  *Id.*

The same logic applies to the County's use of civil penalties to avoid "the expense and delay associated with pursuing alternative remedies through the … criminal justice system."  4-ER-712.  These fines are designed to punish, not disgorge any ill-gotten gains.  *Tull* confirms that the jury right applies.  The court below erred in holding otherwise.

## III.   THIS CASE WARRANTS REASSIGNMENT ON REMAND

This Court should reassign the case to a different judge. Reassignment is appropriate if either (1) it's reasonable to expect the original judge would have "substantial difficulty" putting aside their past views *or* (2) it would "preserve the appearance of justice."  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1034 (9th Cir. 2012); *United States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 779-80 (9th Cir. 1986).  Both factors favor reassignment.

*First*, a judge is less likely to put aside their past views when they've made unfair, dismissive, or "forceful" statements about the party, their claims, or motives before reaching the wrong decision. *Evon*, 688 F.3d at 1034. There was plenty of that here. What stands out are all the times the judge disparaged Plaintiffs' credibility. He repeatedly called their allegations "implausible" and said they were "disagreeable," "disingenuous," "particularly disingenuous," "highly disingenuous," and "not entitled to a presumption of truth." 1-ER-23, -38, -47, -49, -52. He accused them of "obfuscating" facts, "paint[ing] a distorted picture," and making "gross mischaracterizations." 1-ER-6, -24, -47. And he already concluded that Plaintiffs "will not be able to state" a substantive-due-process claim or "that the County has *ever* sought to impose a choice between a government benefit and the exercise of a constitutionally guaranteed right." 1-ER-47, -52 (emphasis added). It's difficult to believe that he's just going to put aside such strongly held views on remand.

*Second*, reassignment would "preserve the appearance of justice." *United States v. Rivera*, 682 F.3d 1223, 1237 (9th Cir. 2012). Statements about the merits and criticisms of a party can create an appearance of partiality—especially when the court "expressed strong views." *Id.*

The trial judge was so adamant that Plaintiffs are wrong that he refused to believe them even when it was what the law demanded.  *United States v. Reyes*, 313 F.3d 1152, 1160 (9th Cir. 2002).  When he had to construe facts in Plaintiffs' favor, he declared the County's code enforcement has been "even-handed, proportionate, non-discriminatory, and non-arbitrary." 1-ER-48-49.  Once the law no longer requires him to accept what Plaintiffs allege as true, and he rules in the County's favor again, it's not going to look like justice.

Plaintiffs and the class they seek to represent have been denied the right to be heard for years while the County enforced an abusive, profit-driven system against them.  The dismissal below delayed justice for years more.  The issues in this case impact an entire community and deserve a judge who people can believe will be impartial.

Because the case didn't make it past a motion to dismiss, there's no risk that reassignment will waste resources.  *See Reyes*, 313 F.3d at 1160.  Quite the opposite.  Sending Plaintiffs back before the same judge will inevitably lead them back to this Court to correct more errors of well-settled law.

## CONCLUSION

This Court should REVERSE the dismissal of each cause of action stated in the FAC and remand the case to a new district judge.

Dated: September 21, 2023

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
(415) 983-1865
thomas.loran@pillsburylaw.com

Derek M. Mayor
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4703
derek.mayor@pillsburylaw.com

Respectfully Submitted,

 /s/ Jared McClain
**INSTITUTE FOR JUSTICE**
Jared McClain
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org

Robert Johnson
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

*Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are not aware of any related cases.

Dated: September 21, 2023

/s/ Jared McClain
Jared McClain
*Counsel for Plaintiffs-Appellants*

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS
## 9TH CIR. CASE NUMBER 23-15847

I am the attorney or self-represented party.

**This brief contains 13,984 words,** including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [  ] it is a joint brief submitted by separately represented parties;
  [  ] a party or parties are filing a single brief in response to multiple briefs; or
  [  ] a party or parties are filing a single brief in response to a longer joint brief.

[] complies with the length limit designated by court order dated _____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated: September 21, 2023          /s/ Jared McClain_____
                                  Jared McClain
                                  *Counsel for Plaintiffs-Appellants*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

U.S. Const. amend. V ......................................................................... 74

U.S. Const. amend. VII ...................................................................... 74

U.S. Const. amend. VIII ..................................................................... 74

U.S. Const. amend. XIV § 1 ............................................................... 74

## U.S. Const. Amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## U.S. Const. Amend. VII

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

## U.S. Const. Amend. VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## U.S. Const. Amend. XIV, § 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.